UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JEROME CEASAR ALVERTO,<br><br>            Petitioner,<br><br>   v.<br><br>MIKE OBENLAND,<br><br>            Respondent. | CASE NO. 3:19-CV-5212-RBJ-DWC<br><br>REPORT AND RECOMMENDATION<br><br>Noting Date: May 22, 2020 |

The District Court has referred this action to United States Magistrate Judge David W. Christel. Petitioner Jerome Ceasar Alverto, proceeding *pro se* and *in forma pauperis*, filed his federal habeas Amended Petition, pursuant to 28 U.S.C. § 2254, seeking relief from his state court judgment and sentence. *See* Dkt. 18. The Court concludes the Amended Petition is time-barred and recommends the Amended Petition be dismissed with prejudice. The Court also recommends a certificate of appealability be denied.

**I.   Background**

   A.  Factual Background

On August 20, 2008, in the Superior Court of Washington for Pierce County ("trial court"), Petitioner was found guilty of attempted murder in the first degree, burglary in the first

degree, and robbery in the first degree. Dkt. 23-1, pp. 2-3. All three counts also involved the use of a firearm and domestic violence. *Id*. Petitioner was sentenced to 460.50 months of confinement on September 12, 2008. *Id.* at pp. 2-11. The Court of Appeals of the State of Washington ("state court of appeals") summarized the facts of Petitioner's case as follows:

> In the early morning of May 13, 2006, Stephanie Wilson received a phone call from her ex-husband, Alverto. Alverto said to Wilson, "So you got a concealed weapons permit, huh?" He told her that she should not have married him and asked her if she was going to marry her boyfriend, Eric Rogers. Alverto told Wilson that she was going to be sorry. Wilson told Alverto she did not want to talk anymore and hung up her phone.
>
> Wilson sent a text message to Rogers, who called her back. Wilson set her house alarm and then went into her bathroom, where she was hit on the head from behind with a wine bottle. Wilson fell to the ground and was then hit repeatedly on the head with a gun. Her attacker told her, as he hit her, that she should not have married him. Wilson recognized Alverto's eyes, body, and voice, even though he wore black clothing, black gloves, and a bandanna around his face.
>
> Alverto then picked Wilson up by her hair, brought her into her bedroom, put a gun to her head, and told her that he was going to kill her and that her kids were going to come home and find her. Wilson asked Alverto to take her elsewhere. She picked up her cellular phone to call the police; however, she ultimately did not call, believing that the police would be unable to detect her location. [Fn. "At trial, Wilson testified that she could not remember what happened to her phone."]
>
> Alverto had told Wilson to put some clothes on, so she went into her walk-in closet. Alverto picked up Wilson's safe, which contained her wedding ring, from inside her closet. He put the safe onto Wilson's bed, taking his eyes off of Wilson. Wilson then ran out of her bedroom and down the stairs. Alverto caught up to her and then proceeded to hit her on the head repeatedly with the butt of his gun.
>
> Next, Alverto told Wilson to turn off her house alarm. As she went to turn off the alarm, Alverto kicked her. At one point, Alverto lost eye contact with Wilson, and she was able to run out the front door. Wilson ran to her neighbor's house; however, Alverto chased after her and shot her in the chest. Wilson collapsed, and Alverto then shot her in her right hand.
>
> Wilson played dead until she heard Alverto run off. She looked up and could not see him, so she went to a neighbor's house for help. Alverto then appeared again and shot her in the back of her neck. Wilson collapsed, and Alverto grabbed her by the hair and pulled her body down the stairs and onto the neighbor's lawn. He shot Wilson twice in the head and then ran off.

Wilson managed to reach a neighbor's house and knocked on the door. This neighbor had previously called 911, around 4:50 a.m., after hearing a series of booms and then seeing a man dragging a woman by her hair off the patio of a neighbor's home. Wilson told the neighbor the name of her attacker; the types of cars he drove, a green Volvo and a champagne Mercedes; and his address. When the police arrived, she gave them the same information that she had given the neighbor.

Pierce County Deputy Sheriffs Mark Fry and Bryan Cline were dispatched to Alverto's residence at around five in the morning. As they were driving, they observed a man in a tan Mercedes. Cline stopped the vehicle, which Alverto was driving. Alverto wore a black shirt, blue pants, and black shoes. Fry noticed blood on Alverto's pants. Alverto denied shooting anyone and told Fry that he was going deer hunting. It was not deer hunting season.

Later that morning, a framing contractor found a duffel bag at a construction site and called the police. The construction site was located approximately one to two miles from Wilson's home. The duffel bag contained a backpack, a leather jacket, light blue respirator-type masks, four gas masks with filters, and a blue bandanna. The jacket pockets held two pairs of silver handcuffs and Wilson's cellular phone. The backpack held three white trash bags; two stocking caps, one with the eyes, nose, and mouth cut out; clothes, including a pair of jeans; a garage door opener for Wilson's garage door; a photograph of Wilson and Rogers; two bracelets, one with an inscription that said "Songs of Solomon 8:6 ... Love, Stephanie." Wilson later identified the bracelet as one she had given Alverto when they were in a relationship. The duffel bag also contained a handgun; there was blood on the lower receiver, on the upper slide around the barrel, and on the pistol grip. Inside the pair of jeans, an investigator found a grocery list with Alverto's name printed across the top of it.

Detectives found no indication of a forced entry into Wilson's home. Police found a steak knife in Wilson's master bedroom, hidden between her mattresses. DNA testing showed that the blood stains on Alverto's pants matched Wilson's DNA.

. . .

On May 16, the State charged Alverto with attempted first degree murder, first degree burglary, and first degree robbery. [Fn. "The State filed an amended information, correcting the spelling of Wilson's name, on August 18, 2008."] Before trial, Alverto moved to suppress "any/all items seized" during a warrantless police search of his house immediately after his arrest. The trial court found that there was not sufficient evidence for a warrantless search of Alverto's home under the community caretaking exception. The trial court ruled that it would not suppress evidence from Alverto's house that the police subsequently obtained under a valid search warrant.

At trial, the trial court admitted into evidence a notebook found in the front seat of Alverto's vehicle. The notebook contained what appeared to be a "to-do list." The following was written on the first page of the notebook: "[R]emove cell (GPS); 5:30[to] 6 am (5 am); has to look natural; cuts, ra[n]sack truck [and] purse." There were also two phone numbers on the notebook's first page; neither was Wilson's. On the second page, the following was written: "(Tools), gun, taser, knife, handcuffs, tape, shoe covers, gloves, flashlight, scarf or face mask, [u]se white face mask, trash bags (2 large, 4 small), stranger hair/condom." The third page states, "(dress code), dark pants, dark shirt, glove, stocking cap [and] face mask, tape gloves to shirk [sic], tape eyebrows, tape pants to shoe cover, tape pockets." The fourth page reads, "(execute)[;] no communication[;] enter garage 5 am, wait til anyone enter; taser individual; handcuff right arm to [left] leg; handcuff [left] arm to right leg; tape arms [and] tape legs together (added restraint)." The final page reads, "(options), set her on fire, act out a carjacking gone bad, taser—stab her in her garage and smear blood in garage." At trial, Wilson identified the handwriting in the notebook as Alverto's.

Previously, Alverto had moved in limine to exclude the notebook. The trial court stated:

> The defense argument had been regarding *State v. Whalon*[, 1 Wash.App. 785, 464 P.2d 730 (1970) ].... And I read that very carefully, and I think it's very distinguishable. That was a situation where there was a charge of [r]ape, and there was [sic] some writings by the defendant having to do with, it appeared to be, sort of planning out a rape.
>
> But in that case, not the victim, but a different woman's name was there, a different woman's address was there, and other contact information. So there was nothing particularly about the victim in that alleged case related to the notebook. And the Court of Appeals then said that was too prejudicial.
>
> This is a little bit different. Perhaps, vaguer, but I think that under 403, it is very prejudicial. It is also very probative. And it is my understanding from-I guess what I'm saying is, even if it's equal in terms of prejudice and probative, everything the State wants to admit is usually prejudicial to the defendant; that on balance that it would be admissible to—in terms of being relevant to the issues in this case.
>
> It's not a 404(b) kind of prior bad act. It is in and of the same time frame, just that it was found in the defendant's car at the time of his arrest, shortly after the alleged assault occurred, but again, on balance. I think that it's probative, given the issues that have been raised by the defense, in terms of identification, and—anyway, that's my ruling.

1    The jury found Alverto guilty on all charges.

2  *State v. Alverto*, 157 Wash. App. 1011 (2010) (internal citations omitted); Dkt. 23-1, pp. 16-20.

3    B.  Procedural Background

4    Petitioner challenged his judgment and sentence on direct appeal. *See* Dkt. 23-1, pp. 30-116. The state court of appeals affirmed Petitioner's conviction on July 27, 2010. *Id*. at pp. 16-28. Petitioner petitioned the Washington State Supreme Court ("state supreme court") for review. *See id*. at pp. 118-59. The state supreme court denied the petition for review on February 1, 2011. *See id*. at p. 161. Petitioner did not file a petitioner for writ of certiorari with the United States Supreme Court.

Petitioner filed several post-conviction motions and an additional federal habeas petition. The post-conviction filings are discussed, as relevant, in the body of this Report and Recommendation.

On March 21, 2019, Petitioner initiated this action. *See* Dkt. 1. On July 22, 2019, Respondent filed an Answer and Memorandum of Authorities, wherein he asserts the Amended Petition was filed after the limitations period expired. Dkt. 22. Respondent maintains the Amended Petition is therefore time-barred and should be dismissed with prejudice. *Id*. Petitioner filed a Response on November 9, 2019. Dkt. 32. On December 9, 2019, the Court directed Respondent to file a supplemental state court record on or before January 17, 2020. Dkt. 34. The Court did not accept additional briefing. *Id*. On January 17, 2020, Respondent filed a supplemental state court record. Dkt. 38. On March 27, 2020, the Court directed Respondent to file a second supplemental state court record on or before May 1, 2020. Dkt. 40. The Court again did not accept additional briefing. *Id*. On May 1, 2020, Respondent filed the second supplemental state court record. Dkt. 41.

## II. Discussion

### A. *Statute of Limitations*

Pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which is codified at 28 U.S.C. § 2241 *et seq.*, a one-year statute of limitations applies to federal habeas petitions. Section 2244(d)(1)(A) requires a prisoner to file a habeas petition within one year of "the date on which the [state court] judgment [of conviction] became final by the conclusion of direct review or the expiration of the time for seeking such review." If during the limitations period a "properly filed application for state post-conviction or other collateral review . . . is pending," the one-year period is tolled. 28 U.S.C. § 2244(d)(2); *see Pace v. DiGulielmo*, 544 U.S. 480, 410 (2005).

A direct review generally concludes and the judgment becomes final either upon the expiration of the time for filing a petition for writ of certiorari with the United States Supreme Court, or when the Supreme Court rules on a timely filed petition for certiorari. *Bowen v. Roe*, 188 F.3d 1157, 1158-59 (9th Cir. 1999). Petitioner filed a direct appeal challenging his conviction and sentence. Dkt. 23-1, pp. 30-116. The state supreme court denied review on February 1, 2011. *See id.* at p. 161. Petitioner did not file a petition for writ of certiorari with the United States Supreme Court, making his direct appeal final on May 2, 2011, the date the time for filing a petition for certiorari expired. *See* U.S. Sup. Ct. Rule 13 (a writ of certiorari must be filed within 90 days after entry of the judgment). The AEDPA limitations period began running the next day, on May 3, 2011. *See Corjasso v. Ayers*, 278 F.3d 874, 877 (9th Cir. 2002).

The limitations period ran for 171 days, then, on October 21, 2011 -- the date Petitioner filed his first PRP -- the limitations period tolled pursuant to 28 U.S.C. § 2244(d)(2). Dkt. 23-1, pp.163-69; Dkt. 23-2; Dkt. 23-3, pp. 2-48. On March 28, 2013 – the date on which Petitioner's

1  first PRP became final – the limitations period resumed. *See* Dkt. 23-5, pp. 2-8, 10, Dkt. 41-1, p.

2  2; *see also Corjasso*, 278 F.3d at 879 (finding the statute of limitations remains tolled until the

3  state collateral attack becomes final); *Certification from United States Court of Appeals, Ninth*

4  *Circuit in Phonsavanh Phongmanivan v. Haynes*, 458 P.3d 767, 770 (Wash. 2020) (a PRP

5  becomes final under Washington state law when the certificate of finality is issued). When his

6  PRP became final, Petitioner had 194 days (for a total of one year) remaining, or until October 8,

7  2013, to file a timely federal habeas petition or otherwise toll the limitations period.

8        The limitations period ran for another 160 days (for a total of 331 days). Then, on

9  September 4, 2013, Petitioner filed a motion for a new trial with the state trial court. Dkt. 23-8,

10 pp. 68-87. The state trial court transferred the matter to the state court of appeals to be handled as

11 a PRP ("second PRP"), finding the petition appeared to be time-barred. *See id*. at pp. 87-88, 90,

12 92-93; Dkt. 41-1, p. 13. On June 30, 2014, Petitioner filed a motion to withdraw the second PRP,

13 which was granted on September 2, 2014. Dkt. 23-8, pp. 95-97, 99; *see also* Dkt. 41-1, p. 11.

14 Petitioner filed a second motion for a new trial on July 29, 2014, while the second PRP was

15 pending. *See* Dkt. 23-9, pp. 2-115. The state trial court also transferred the second motion for a

16 new trial to the court of appeals to be considered as a PRP ("third PRP"), finding the petition

17 appeared to be time-barred. *Id*. at pp. 151-53, 155. On October 21, 2016, Petitioner moved to

18 voluntarily withdraw the third PRP. *Id*. at pp. 157-95. On November 1, 2016, the court of appeals

19 granted Petitioner's motion to withdraw and dismissed the third PRP. *Id*. at p. 197. The state

20 court of appeals issued a certificate of finality on February 17, 2017. Dkt. 41-1, p. 9.

21       Respondent argues the second and third PRPs did not toll the limitations period because

22 the two PRPs would have been dismissed as untimely. *See* Dkt. 22. An untimely state collateral

23 attack does not toll the limitations period. *See Pace*, 544 U.S. at 417. While the state trial court

24

referenced that the second and third PRPs appeared to be time-barred, the PRPs were not dismissed by the state court as untimely. *See* Dkt. 23-8, p. 99; Dkt. 23-9, p. 197. Regardless of whether the Court finds the first and second motions for a new trial tolled the limitations period, the Amended Petition is untimely. Therefore, the Court will assume, without deciding, these two PRPs would toll the limitations period.

The statute of limitations began to run again on February 17, 2017. Petitioner had thirty-four days remaining, or until March 23, 2017, to file a federal habeas petition or toll the limitations period. As discussed below, Petitioner did not file any additional collateral attacks that would toll the limitations period.

B. *Additional Collateral Attacks and Motions*

Petitioner contends his additional state PRPs, motions for DNA testing, and previous federal habeas petition toll the limitations period. *See* Dkt. 18, 32.

First, Petitioner has filed additional PRPs. While Petitioner's third PRP was pending, Petitioner filed a third motion for a new trial on August 1, 2016. *See* Dkt. 23-5, pp. 12-13, 15-88. On November 2, 2016, the trial court transferred the third motion for a new trial to the state court of appeals to be considered as a PRP ("fourth PRP"). *Id*. at pp. 12-13. The state court of appeals dismissed the fourth PRP as untimely. Dkt. 23-6, pp. 134-36. The state supreme court denied Petitioner's motion for discretionary review on September 27, 2018. Dkt. 23-7, pp. 14-16; Dkt. 41-1, p. 5. Petitioner also filed a fifth PRP in 2018. *See* Dkt. 23-7, pp. 18-355. This PRP was dismissed as time-barred on March 15, 2019. Dkt. 23-8, pp. 65-66; Dkt. 41-1, p. 7.

As discussed above, an untimely state collateral attack does not toll the limitations period. *See Pace*, 544 U.S. at 417; *Thorson v. Palmer*, 479 F.3d 643, 645 (9th Cir. 2007); *Bonner v. Carey*, 425 F.3d 1145, 1148-49 (9th Cir. 2005). As Petitioner's additional PRPs were

1  dismissed as untimely, these PRPs did not toll the limitations period. *See Waldron-Ramsey v.*
2  *Pacholke*, 556 F.3d 1008, 1010–11 (9th Cir. 2009) ("the United States Supreme Court has
3  explicitly held that an untimely state petition does not toll the AEDPA statute of limitations").

4        Second, Petitioner filed three motions for post-conviction DNA testing under RCW
5  10.73.170. *See* Dkt. 23-9, pp. 199-201; Dkt. 23-3, pp. 39-48; Dkt. 23-10, pp. 64-117. The
6  motions for post-conviction DNA testing did not toll the limitations period because the motions
7  did not constitute a collateral challenge under state law that is subject to statutory tolling. The
8  purpose of RCW 10.73.170 is "to provide a means for a convicted person to obtain DNA
9  evidence to that would support a petition for postconviction relief." *State v. Riofta*, 166 Wash.2d
10 358, 368 (2009). As a motion for post-conviction DNA testing provides a means to seek post-
11 conviction relief, it does not toll the limitations period. *See Kennedy v. Ryan*, 2018 WL 7570288,
12 at *3 (D. Ariz. Sept. 18, 2018) (finding three motions for DNA testing did not have any statutory
13 tolling effect because a petition for DNA testing under Arizona law differs from a petition for
14 post-conviction relief); *Sakellaridis v. Warden, Corcoran State Prison*, 2012 WL 2374562, at *5
15 (C.D. Cal. June 22, 2012) ("[W]hile Petitioner presumably sought DNA testing so he could *then*
16 challenge his underlying conviction, his attempts to secure a DNA test were not themselves
17 'properly filed application[s] for State post-conviction or other collateral review *with respect to*
18 *the pertinent judgment or claim.*'") (emphasis in original) (citing 28 U.S.C. § 2244(d)(2)).

19       Third, Petitioner asserts the limitations period was tolled while his previous federal
20 habeas petition was pending. *See* Dkt. 32. On June 19, 2013, Petitioner filed a federal habeas
21 petition in this Court ("first federal petition"). *See Alverto v. Obenland*, Case No. 3:13-CV-5490-
22 RJB. Petitioner requested to voluntarily dismiss the first federal petition and, on September 18,
23 2017, the case was dismissed without prejudice. *See id*. at Dkt. 73, 76, 79, 80. "The filing of a §
24

2254 petition, however, does not toll or stop the statute of limitations. Instead, it continues to run." *Kinney v. Setter*, 2013 WL 2338261, at *2 (W.D. Wash. May 29, 2013) (citing *Duncan v. Walker*, 533 U.S. 167, 181–182 (2001)). Therefore, the first federal petition did not toll the limitations period.

For the above stated reasons, the Court finds Petitioner has not shown the Amended Petition was timely filed. Petitioner did not file a state collateral attack or federal petition that tolled the limitations period on or before March 23, 2017, the date the limitations period expired. Petitioner did not initiate this case until March 21, 2019, approximately two years after the limitations period expired. Therefore, the Amended Petition is untimely.

C. *Equitable Tolling*

The AEDPA statute of limitations is subject to equitable tolling where the petitioner pursued his rights diligently and "some extraordinary circumstance stood in his way." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (internal quotations omitted). To receive equitable tolling, a petitioner at the very least must show the extraordinary circumstances "were the but-for and proximate cause of his untimeliness." *Ansaldo v. Knowles*, 143 Fed. App'x. 839, 840 (9th Cir. 2005).

Petitioner contends he is entitled to equitable tolling because he was warned that police would harm his family if he testified. Dkt. 32. Over the last ten years, Petitioner has been filing motions, PRPs, and a federal habeas petition. *See* Section III.A., *supra*. The alleged threat to his family did not deter him from filing his first federal habeas petition or all the various state court filings challenging his judgment and sentence. Therefore, Petitioner has not shown the alleged police threats to his family were an extraordinary circumstance causing his untimeliness.

Petitioner also asserts the limitations period tolled when he was transferred to different correctional facilities without his legal materials. Dkt. 32. Petitioner states the limitations period

should be tolled from September 25, 2017 through February 15, 2018, when he received his legal materials. *See id.* at pp. 40-41. He also alleges his living conditions were inhumane and he was separated from his legal materials from April 12, 2018 until May 23, 2018 causing an extraordinary circumstance that warrants equitable tolling. *Id.* at pp. 41-42. The limitations period had already expired prior to September 25, 2017; thus, even if Petitioner's separation from his legal materials constituted an extraordinary circumstance, the limitations period had expired prior to alleged circumstance that prevented his timely filing. Petitioner has also not shown how his lack of access to his legal materials prevented him from timely filing this action. *See Ford v. Pliler,* 590 F.3d 782, 790 (9th Cir.2009) (finding that a petitioner "is not entitled to equitable tolling on the ground that he did not have his legal files [when] the record shows that he was aware of the factual basis of his claims without them."). Further, Petitioner was filing motions in the state courts during the alleged periods he was without his legal materials. *See e.g.* Dkt. 23-7, p. 2 (motion for discretionary review filed October 31, 2017). For these reasons, Petitioner has not shown he is entitled to equitable tolling because he lacked access to his legal materials.

In summation, Petitioner fails to show he is entitled to equitable tolling.

D.  *Actual Innocence*

The statute of limitations is subject to an actual innocence exception. *See Schlup v. Delo*, 513 U.S. 298 (1995). In order to present otherwise time-barred claims to a federal habeas court under *Schlup*, a petitioner must produce sufficient proof of his actual innocence to bring him "within the 'narrow class of cases ... implicating a fundamental miscarriage of justice.'" 513 U.S. at 314–15 (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)). The evidence of innocence must be "so strong that a court cannot have confidence in the outcome of the trial unless the

court is also satisfied that the trial was free of nonharmless constitutional error." *Schlup*, 513 U.S. at 316.

A "petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327. Under *Schlup*, Petitioner is required "to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324. The habeas court must then "consider all the evidence, old and new, incriminating and exculpatory," admissible at trial or not. *House v. Bell*, 547 U.S. 518, 538 (2006) (internal quotation marks omitted). On this complete record, the court makes a "'probabilistic determination about what reasonable, properly instructed jurors would do.'" *Id.* at 538 (quoting *Schlup*, 513 U.S. at 329).

Here, Petitioner contends the following evidence shows he is actually innocent: (1) a hair found on a neighbor's door when the victim went to get help does not match Petitioner's hair profile; (2) handwriting analysis showing Petitioner was not the author of a list detailing things to do to kill a woman; (3) newly discovered witness testimony; and (4) Petitioner's phone records showing he did not call the victim. Dkt. 32. Petitioner asserts he overcomes the time-bar because this evidence shows he is actually innocent.

The Court notes, initially, the Respondent argues the evidence is not "new" because Petitioner presented each piece of evidence in his post-conviction state pleadings. Dkt. 22. Under Ninth Circuit precedent, evidence need only be "newly presented," meaning evidence is "new" if it was not presented at trial. *Griffin v. Johnson*, 350 F.3d 956, 963 (9th Cir. 2003). Respondent does not contend the evidence relied on by Petitioner to show he is actually innocent was presented at trial. Therefore, the Court declines to apply Respondent's general assertion that,

because the evidence was presented in post-conviction filings in the state court, the evidence is not "new."

First, Petitioner asserts he is actually innocent because a hair found on the sliding glass door at Wilson's (the victim) neighbor's house, where Wilson went to call for help, does not match Petitioner's hair profile. *See* Dkt. 32, p. 43; Dkt. 23-10, p. 211. The hair has not been DNA tested. *See* Dkt. 35. However, the record indicates the parties agreed the hair did not belong to Petitioner. Dkt. 32, pp. 112-13. In post-conviction proceedings, the trial court stated the hair would not demonstrate innocence. *Id*. at p. 114. The state court of appeals also found that, even if the hair belonged to the Wilson's boyfriend, Eric Rogers, the hair could have ended up on the door through innocent means and did not demonstrate Petitioner's innocence on a more probable than not basis. Dkt. 23-10, p. 213. This Court agrees.

Petitioner has not adequately explained how an untested hair located at a neighbor's home shows Petitioner is actually innocent. There is also no evidence, beyond Petitioner's speculation, that the hair might match Rogers. As there is no evidence regarding to whom the hair belongs, Petitioner fails to explain how this shows his innocence. Further, as discussed by the state court, even if the hair did belong to Rogers, the single hair could have innocently transferred from Rogers to Wilson, as they had been together earlier in the evening. Moreover, Petitioner has not explained how the single hair overcomes the strong evidence at trial. *See* Dkt. 32, 33. For example, at trial, Wilson identified Petitioner as her attacker and Wilson's blood was found on Petitioner's clothes the morning of the attack. *See* Dkt. 23-1, pp. 16-19; Dkt. 38-1, p. 313; Dkt. 38-2, pp. 493-97. Petitioner has not shown it is more likely than not that no reasonable juror would have convicted him in the light of the single, unidentified hair found on the sliding

glass door at Wilson's neighbor's house. Therefore, this evidence does not meet the *Schlup* actual innocence standard and overcome the time-bar.

Second, Petitioner contends handwriting analysis shows Petitioner was not the author of a list detailing things to do to kill a woman. Dkt. 32; Dkt. 18-15. At trial, a notebook, which was recovered from Petitioner's vehicle on the morning of the attack, was admitted into evidence. *See* Dkt. 38-2, pp. 214-15. As described in the factual background, the notebook contained a list of things to do to kill a woman. *See id*. at pp. 217-18; Dkt. 23-1, pp. 19-20. Wilson testified that the handwriting in the notebook belonged to Petitioner. Dkt. 38-2, pp. 526-27.

Petitioner has submitted a notarized letter from David Cupp, a handwriting examiner. Dkt. 18-15. Cupp appears to have compared one sample of Petitioner's writing and one sample of Roger's handwriting with three pages from the notebook. *Id*. Cupp concluded the three pages from the notebook contained the handwriting of Rogers, not Petitioner. *Id*. at p. 5. Regardless of whether this evidence is new, this evidence is not reliable. There is no evidence regarding Cupp's qualifications. Further, Cupp used only two samples and made his findings based on the fact he was told one sample was Petitioner's writing and one sample was Rogers' writing. *See* Dkt. 18-15. The Court finds this evidence is not reliable. *See* Dkt. 23-7, p. 15 (state court finding Cupp's opinion was based on inadmissible hearsay); *House v. Bell*, 547 U.S. 518, 557 (2006) ("the new evidence is not simply taken at face value; its reliability has to be tested").

Moreover, Petitioner has not shown that no reasonable juror would have convicted Petitioner on a more likely than not basis in light of Cupp's opinion. As previously stated, Wilson testified Petitioner was her attacker as she identified him by his eyes, body type, and voice during the attack. Dkt. 38-1, p. 313. Petitioner also had Wilson's blood on his pants when he was stopped by police the morning of the attack on Wilson. *See* Dkt. 38-2, pp. 493-97.

1 Further, the notebook was found in Petitioner's possession, in his car on the morning of the
2 attack, and Wilson identified Petitioner's handwriting was the handwriting in the notebook. Dkt.
3 38-2, pp. 214-18, 526-27. At most, Cupp's opinion, which the Court finds is not reliable, would
4 have provided a second opinion regarding the author of the handwriting in the notebook found in
5 Petitioner's car. In light of the evidence, Cupp's opinion is not sufficient to show Petitioner is
6 actually innocent and does not overcome the time-bar.

7 Third, Petitioner contends he has overcome the time-bar and shown he is actually
8 innocent based on Rogers' confession to Maurice Thrower, an inmate who was housed with
9 Petitioner. Dkt. 32. Thrower provided an affidavit stating a man named Eric told Thrower that he
10 shot his girlfriend and his girlfriend's ex-husband went to jail for the attempted murder. *Id*. at pp.
11 87-88. Thrower's affidavit contains hearsay statements from an individual named Eric, who
12 allegedly tried to murder his girlfriend. The hearsay statements do not name Petitioner or his
13 girlfriend, nor does it identify Eric's last name. While facts in Thrower's affidavit mirror the
14 facts of this case and the victim was dating a man named Eric, the evidence is not sufficiently
15 reliable to show actual innocence. Furthermore, as previously stated, Wilson identified Petitioner
16 as her attacker and Petitioner had Wilson's blood on his clothing the morning of the attack. *See*
17 Dkt. 38-1, p. 313; Dkt. 38-2, pp. 493-97. There is also evidence Rogers and Petitioner look
18 opposite – different height, body type, facial features. Dkt. 38-1, pp. 403, 528-29. Rogers also
19 testified at trial about the morning of the attack and testified he did not attack Wilson. Dkt. 38-2,
20 pp. 20-76. For these reasons, Petitioner has not shown it is more likely than not that no
21 reasonable juror would have convicted him in the light of Thrower's hearsay affidavit.
22 Therefore, Thrower's affidavit is not sufficient to show Petitioner is actually innocent and does
23 not overcome the time-bar.
24

1     Fourth, Petitioner asserts he overcomes the time-bar because phone records show he did
2 not call Wilson on the morning of the attack. Dkt. 32. Evidence at trial showed Wilson received a
3 call from Petitioner threatening Wilson shortly before she was attacked on the morning of May
4 13, 2006. Dkt. 38-1, pp. 305-313. The caller-id on Wilson's phone showed "unknown." *Id*. at  p.
5 305. Petitioner has submitted evidence of a cell phone bill in his name. Dkt. 18-16. The last call
6 reported on the bill was at 10:39 p.m. on May 12, 2006. *Id*. at p. 6. While the phone record has
7 not been authenticated, the record shows only that Petitioner did not make a call from a phone
8 associated with the phone number on the bill on May 13, 2006. As Petitioner could have made a
9 call from a different phone, the phone record is not new, reliable evidence showing Petitioner is
10 actually innocent. Therefore, Petitioner has not shown it is more likely than not that no
11 reasonable juror would have convicted him in the light of this phone bill. As such, the phone bill
12 is not sufficient to show Petitioner is actually innocent and does not overcome the time-bar.

13     The Court has considered the four pieces of evidence Petitioner contends show he is
14 actually innocent. The Court finds this evidence fails to show Petitioner meets the standard set
15 forth in *Schlup*, in that, the evidence is not so strong that this Court does not have confidence in
16 the outcome of the trial. Therefore, Petitioner has not shown he is actually innocent and does not
17 overcome the time-bar.

18     **III.    Evidentiary Hearing**

19     The decision to hold an evidentiary hearing is committed to the Court's discretion.
20 *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a
21 hearing could enable an applicant to prove the petition's factual allegations, which, if true, would
22 entitle the applicant to federal habeas relief." *Id.* at 474. In determining whether relief is
23 available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the
24

state court. *Cullen*, 563 U.S. at 181-82. A hearing is not required if the allegations would not entitle Petitioner to relief under §2254(d). *Landrigan*, 550 U.S. at 474. "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id*. The Court finds it is not necessary to hold an evidentiary hearing in this case because, as discussed in this Report and Recommendation, the Amended Petition may be resolved on the existing state court record.

### IV.     Certificate of Appealability

A petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district court's dismissal of the federal habeas petition only after obtaining a certificate of appealability (COA) from a district or circuit judge. *See* 28 U.S.C. § 2253(c). "A certificate of appealability may issue . . . only if the [petitioner] has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). No jurist of reason could disagree with this Court's evaluation of Petitioner's claims or would conclude the issues presented in the Amended Petition should proceed further. Therefore, the Court concludes Petitioner is not entitled to a certificate of appealability with respect to this Amended Petition.

### V.     Conclusion

Petitioner's Amended Petition is untimely as it was filed more than one year after the state court judgment became final. There are no extraordinary circumstances in this case requiring the application of equitable tolling principles. Furthermore, Petitioner has not presented

sufficient evidence to show he is actually innocent to overcome the time-bar. Therefore, the Amended Petition is barred by the one-year limitations period imposed under 28 U.S.C. § 2244(d) and should be dismissed with prejudice. No evidentiary hearing is required and a certificate of appealability should be denied.

As the Court finds a certificate of appealability should not be issued and that the Amended Petition should not proceed further, the Court recommends *in forma pauperis* status be revoked on appeal.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of de novo review by the district judge. *See* 28 U.S.C. § 636(b)(1)(C). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on May 22, 2020, as noted in the caption.

Dated this 7th day of May, 2020.

David W. Christel
United States Magistrate Judge